IN RE ESTATE OF CHARLES D. MATHEWS.
W. T. BARSTOW, APPELLEE, V. CITY NATIONAL BANK OF
LINCOLN, APPELLANT.

279 N. W. 301

FILED APRIL 26, 1938. NO. 30275.

*Stewart, Stewart & Whitworth* and *Charles B. Paine,*
for appellant.

*J. W. Kinsinger* and *H. C. Henderson, contra.*

Heard before GOSS, C. J., ROSE, EBERLY, DAY, CARTER
and MESSMORE, JJ.

CARTER, J.

In this case it appears that the City National Bank of
Lincoln filed a claim against the estate of Charles D.

Mathews, deceased, in the amount of $268,135.98 and interest. The claim was allowed and no appeal taken therefrom. Several years later the executor of the estate of Charles D. Mathews filed a motion in the same proceeding to require the bank to satisfy its claim for the reason that the notes on which the claim was based were canceled, paid and discharged. The county court denied the executor's motion and no appeal was taken therefrom by the executor. However, the appellee, W. T. Barstow, as a general creditor of the estate, perfected an appeal to the district court. After a trial, the district court held that the bank's claim was satisfied and discharged and that the claim and order of allowance should be satisfied and discharged of record. From this order, the bank appeals. The only question for our determination is whether the claim allowed by the county court has been satisfied and discharged as found by the district court.

The record discloses that the Continental Mortgage & Land Company, hereinafter called the Continental Company, was a corporation engaged primarily in the buying and selling of Canadian lands. William White and Charles D. Mathews owned all of the stock of the corporation during the times mentioned herein until White became the sole owner in 1924. White was its president and handled all of the business transactions of the company. During 1922 the Continental Company purchased a large quantity of land in Canada, which necessitated the borrowing of money from the City National Bank of Lincoln in the principal amount of $278,135.98.

The Continental Company pledged its stock and all of its Canadian land contracts as security for the loan. In addition thereto, White indorsed all of the notes and Mathews indorsed all except one for $10,000, which was given subsequent to his death. Mathews died on October 4, 1922, and the claim of the bank was filed against his estate on March 14, 1923, and allowed on February 13, 1924.

The evidence discloses that in 1926 the bank demanded

that the Canadian land contracts be sold and that the amounts derived therefrom be applied on the notes of the Continental Company. An agreement was drafted: which provided in substance that White should proceed. to sell the Canadian lands and would receive $250 a month salary and his traveling expenses out of the collateral for so doing. In addition thereto, the agreement provided that, when the bank had received $100,000 under the agreement, and prior liens on the Canadian lands had been reduced $50,000, White was to be released from all further liability on his personal indorsement. The agreement also provided that, when the bank had received a net of $250,000 from the liquidation of the land contracts, any surplus obtained therefrom was to be divided equally between the bank and White. Incorporated in the agreement was the further provision: "However, the bank reserves its right of action and claim against the estate of Charles D. Mathews, deceased, as guarantor on the notes herein mentioned." This agreement was signed by the Continental Company and White, but it was never signed by the bank. The evidence discloses, however, that White proceeded to liquidate the land contracts and received a salary of $250 a month and traveling expenses for so doing. The evidence also shows that White paid in an amount in excess of $250,000 and he thereafter was released from any personal liability on his indorsement on the notes. He also received back the stock of the Continental Company, which had been pledged, and a half interest in two tracts of the land which had been included in the collateral security for the loan. And also White received back all of the notes from the bank at a time when he had become the sole owner of the stock of the Continental Company. At the time of the trial of the case in the district court, appellant claimed that there was still a sum in excess of $200,000 due on its claim against the estate of Charles D. Mathews, after crediting all payments made by White.

An officer of the bank testified that the bank did not sign the agreement for the reason that it might injure the

rights of the bank in some litigation against the executor of the Charles D. Mathews estate then pending in the Canadian courts, and for the further reason that the signing of the agreement might amount to a waiver of its claim against the Mathews estate filed and allowed in the county court of Lancaster county. It appears, however, that the agreement was carried out by the parties thereto. The bank, having received the benefits of the contract, and having treated the contract as binding between the parties thereto, is not now in position to say that it was ineffective. In the recent case of *Utilities Ins. Co. v. Stuart, ante,* p. 413, 278 N. W. 827, this court, in discussing this point, said: "In the absence of some statutory requirement or specific agreement that a contract is not to become effective until signed, assent thereto may be shown in other ways, as by accepting or delivering the contract and acting under it." We believe this rule to be controlling in the case at bar.

Under the contract, White was to be personally released as indorser on the notes upon the happening of certain conditions set out therein. These conditions were complied with and White was released, in writing, and the original notes returned to him. Appellee contends that this releases the other indorser, Mathews, for the reason that the delivery of the notes to White, the president, manager and sole stockholder of the Continental Company, the principal debtor, discharged the obligation.

The Negotiable Instruments Law provides in part as follows: "A negotiable instrument is discharged: * * * Third. By the intentional cancelation thereof by the holder; Fourth. By any other act which will discharge a simple contract for the payment of money; Fifth. When the principal debtor becomes the holder of the instrument at or after maturity in his own right." Comp. St. 1929, sec. 62-801.

"A person secondarily liable on the instrument is discharged: First. By any act which discharged the instrument; * * * Third. By the discharge of a prior party; * * * Fifth. By a release of the principal debtor, unless the

holder's right of recourse against the party secondarily liable is expressly reserved." Comp. St. 1929, sec. 62-802.

When the principal debtor becomes the holder of a negotiable instrument at or after maturity in his own right, the instrument is discharged. *Joy v. Buchanan*, 131 Neb. 83, 267 N. W. 174.

Appellant contends, however, that the notes were delivered to White in his individual capacity and not as the president, manager or sole stockholder of the Continental Company. It must be borne in mind that the notes in question were payable to "ourselves" and indorsed by the Continental Mortgage & Land Company, William White and C. D. Mathews. White testified that he received them in his capacity as president of the Continental Company. It is quite apparent that the written release procured by White was sufficient to release his personal liability. There was therefore no object to be gained by a delivery of the notes to him personally. The record also shows that the last five notes returned to White were marked "paid." This indicates an intent on the part of the bank to treat the obligations represented by the notes as satisfied. The only logical conclusion that can be drawn is that they were delivered back to White as an officer of the company. Fraud or mistake is not alleged or claimed. It is clear therefore that the Continental Company, the party primarily liable on the notes, became the holder thereof in its own right after maturity. Under the Negotiable Instruments Law, heretofore cited, and the decisions of this court, the notes were discharged. The instruments representing the indebtedness having been discharged, those secondarily liable were discharged by virtue of the provision numbered first of section 62-802, Comp. St. 1929, heretofore quoted.

Appellant contends that the liability of Charles D. Mathews was reserved in the contract between White and the bank. It is not necessary for us to discuss the effect of this provision of the contract in so far as it affected Mathews, who was not a party to it. The fact remains that, after the contract was carried out, the bank, by delivering

the notes to the Continental Company, thereby discharged the notes. Under the Negotiable Instruments Law, a party may be released without destroying the entire instrument, but if the instrument be discharged it extinguishes the liability of all the parties thereto as a matter of law. The instrument having been discharged, it is not necessary for us to discuss the effect of the loss of Mathews' right of indemnity against White and the property pledged as security for the debt which was returned to White free of the lien of the debt.

Appellant contends that the allowance of the claim of the bank against the estate of Charles D. Mathews was in effect a judgment and that the disposition of the notes subsequent thereto could not affect it in any way. With this we are not in accord.

We believe the correct rule is stated in an annotation to *Little Rock & F. S. Ry. Co. v. Wells,* 54 Am. St. Rep. 216 (61 Ark. 354, 33 S. W. 208), at page 258, wherein it is said: "The better opinion, however, is that a judgment does not, through the operation of the law of merger, change the relation of the parties so that a defendant who, before its rendition, was a surety becomes a principal. At least as against all persons chargeable with notice that he is a surety, any act which, had it occurred before the judgment, would have released him has the same effect when occurring after a judgment, and constitutes a sufficient defense to any action thereon." This court, in the case of *Drexel v. Pusey,* 57 Neb. 30, 77 N. W. 351, adopted the foregoing rule, the applicable language being: "We adopt that which is deemed the better rule, namely, that the judgment entered on the note did not preclude Coffman from proving that he signed as accommodation indorser merely, and from insisting that he was discharged by the release by the judgment creditor of the property of Morrison." See, also, *Trotter v. Strong,* 63 Ill. 272. We necessarily conclude that the judgment of the county court allowing the bank's claim, but not determining whether the debtor was primarily or secondarily liable, does not preclude the appellee from show-

ing a release of the debtor as indorser by a subsequent discharge of the notes representing the indebtedness.

Appellant also contends that appellee did not prove sufficient interest to maintain this appeal. Appellee alleged in his petition that he was a creditor of the estate, that his claim had been allowed and that the sum of $12,275.48 remained unpaid. Appellant in its answer admitted the filing and allowance of the claim and alleged that it had been paid, settled, satisfied and discharged. Upon a trial of the case, appellee offered in evidence the claim and the order allowing it. Appellant offered no evidence tending to prove that the claim of appellee had been paid or discharged. We are of the opinion that this evidence was sufficient to sustain the trial court's finding that appellee had sufficient interest in the suit to maintain an appeal.

Under the evidence in this case, the trial court properly ordered appellant's judgment satisfied and discharged of record under the authority of *Luikart v. Bredthauer*, 132 Neb. 62, 271 N. W. 165, wherein this court said: "Appellant contends that the court was without jurisdiction to consider appellee's application to have the records of the court show that the judgment was barred by the discharge in bankruptcy. We are of the opinion that a motion or application filed in the same action in which the judgment is rendered is a proper procedure to obtain the relief to which appellee is entitled."

We find no prejudicial error in the record and the judgment of the trial court is

AFFIRMED.