McCaslin *et al. v.* Willis *et ux.*

(In Banc. Nov. 13, 1944. Suggestion of Error Overruled Dec. 22, 1944.)

[19 So. (2d) 751. No. 35685.]

**W. J. Evans** and **Paul M. Moore**, both of Calhoun City, for appellants.

**Stone & Stone,** of Coffeeville, for appellees.

**McGehee, J.**, delivered the opinion of the court.

This suit was filed by the appellees, J. M. Willis and wife, to cancel as a cloud upon the title to 480 acres of land their certain promissory note for the sum of $3,704.68, payable to John P. McCaslin or bearer, and also to cancel a deed of trust on the land, crops and personal property securing the said indebtedness. The note and deed of trust, although bearing date of January 1, 1942, were alleged and shown to have been prepared, executed and delivered on May 6, 1942, and they became due December 15, 1942, after the death of the said McCaslin on September 15th of that year.

The bill of complaint alleges payment of the note in full by the makers thereof, and also the surrender by McCaslin of both the note and deed of trust to them shortly after the execution of the same. The joint answer of Mrs. Florence McCaslin, the administratrix of the estate of John P. McCaslin, deceased, who is his widow and sole heir-at-law, and of Paul M. Moore, trustee, denies that the indebtedness or any part thereof has been paid, or that the complainants were rightfully in possession of the said note and deed of trust. Upon the trial, both of these documents were introduced in evidence by the complain-

ants, through their attorney, who testified that he had received the same from his clients about Thanksgiving day prior to their maturity. Thereupon, the complainants rested their case upon the theory that proof of their possession of the note and deed of trust made a prima facie case of payment. Neither of the two instruments of writing were marked paid or satisfied, and there was no endorsement or other notation shown thereon. Moreover, the complainants did not allege or prove, in support of their claim of payment, that they held either a paid check or receipt to evidence the same, but rather they seem to have relied solely upon the fact that they were in possession of the note and deed of trust long prior to maturity thereof, invoking section 160, Code of 1942, subsections (4) and (5), of the Uniform Negotiable Instruments Law, which provides how a negotiable instrument is discharged:

"(4) By any other act which will discharge a simple contract for the payment of money.

"(5) When the principal debtor becomes the holder of the instrument at or after maturity in his own right."

Thereupon, the defendants moved the court to exclude the evidence and render a decree in their favor dismissing the bill of complaint, but which motion was by the Court overruled. However, instead of resting their case upon what they conceived to be the failure of the complainants to meet the burden of proving the alleged payment, the defendants proceeded to offer proof of facts and circumstances to show that the indebtedness had not been paid. In fact, counsel for the respective parties seem to have interpreted the holding of the trial court as meaning that the burden of proving such fact rested upon the defendants in view of the showing that the note and deed of trust were in possession of the makers long prior to the maturity thereof, it being assigned as error on appeal here by counsel for the appellant, Mrs. McCaslin, that she was required by the court to carry such burden and it is also stated in the brief of counsel for the appel-

lees J. M. Willis and wife that the court held that such possession "cast the burden upon the defendants, appellant, to show that Willis had not paid the debt." What the chancellor had said in announcing his decision cancelling the note and deed of trust was that "the issue now before the Court is whether or not the prima facie case made by the complainants has been overturned by the evidence offered by the defendant, and all the evidence in the case"; whereas, it is contended by the appellant, Mrs. McCaslin, that she should not have been required to "overturn" the evidence relied on as constituting payment, but only to balance the scale in order to prevent the cancellation of the note as sought by the appellees, and as was decreed, even if it should be held that possession of the note by the makers before its maturity made a prima facie case of payment.

To meet the issue thus presented to them, the defendants undertook to call J. M. Willis to testify in regard to the occasion, facts and circumstances of his alleged payment of the note, but objection was made thereto on behalf of his wife, a party litigant; and the same was sustained under section 1689, Code of 1942, making the husband and wife incompetent as witnesses where either of them is a party litigant, without the consent of both; and likewise, an objection on his behalf to her being called as a witness was sustained. Thereupon, the complainants introduced Roane Lovern, a nephew of Mrs. Florence McCaslin, who testified that the said John P. McCaslin died at the age of seventy-five years, from a cancer of the head, on September 15th, 1942; that he was a fairly successful small-town business man, who had been able to look after his affairs until shortly prior to his death; that about ten days before he died he requested the witness to look in a small box used as a file for papers there in his bedroom, where he kept his notes and deeds of trust alphabetically arranged, and that he wrote the debtors for him, presumably to call attention to the approaching maturity of their indebtedness, stating that he would not

be able to further attend to any business. That upon looking in this filing-box for the names of those to whom he was to write, etc., the witness came to the letter "W" in the file, and said, "Mr. McCaslin, I don't see the new Willis papers. While I see the old ones here the new ones are not." That Mr. McCaslin replied, "Well, they are just alphabetically filed wrong, they are in there somewhere. I am too sick to look for them now, and if you don't find them I will find them later. . . . Mr. Willis is the only one that I am afraid I will have a big loss on. The others won't be so much . . . "

The witness, Lovern, further testified that about a week after the death of Mr. McCaslin, he, in company with Mrs. McCaslin, called to see Mr. and Mrs. Willis in regard to the indebtedness, when Mr. Willis claimed that he had paid the $3,704.68 note to Mr. McCaslin in cash on the street in front of the Ford Building in Calhoun City; and that on this same occasion the latter had the note and deed of trust with him, and surrendered the same to the said Willis, one of the comakers thereof, as aforesaid. That thereupon the note and deed of trust were produced by the Willises, and that upon being asked when the payment was made, Mr. Willis stated that it was about the first of May, and that Mrs. Willis then stated that it was about the 6th day of May. That "then they both agreed that it was sometime in there the latter part of May." That Mr. Willis claimed that he got some of the money from his son who was in the army, some from his brother and that he already had some of it. Following this conversation, the witness, Lovern, and Mrs. McCaslin, returned home by way of Pittsboro, and as anticipated saw the deed of trust had not been cancelled of record; and it was shown by other testimony that no request had ever been made of the trustee by anyone to cancel the same, notwithstanding that the critical illness of the beneficiary therein was necessarily known to the interested parties, and it was not claimed that there were witnesses to the alleged payment of the indebtedness.

The Ford Building in Calhoun City was shown to be only a short distance from the Calhoun County Bank, where Mr..McCaslin carried his principal banking account. It was further shown that no deposit that reasonably approximated this alleged collection of money was made to this account from May 2, 1942, until the time of the death of Mr. McCaslin, and that while he had $1,575 in cash at his home when he died, it was shown that $1,250 of this amount had been withdrawn from the bank in cash one week prior to his death. He was shown to have had $875 on deposit with the Deposit Guaranty Bank & Trust Company, at Jackson, but this fund was accounted for as having come from a source other than the Willises.

Thus, it will be seen that the evidence regarding the alleged payment of the note was secondary evidence, since no one testified under oath in court that Mr. Willis had ever paid the $3,704.68 to Mr. McCaslin, or that the latter surrendered the note and deed of trust to him in return. But the complainants offered in rebuttal a witness who claimed to have been on friendly terms with the deceased, except to the extent of having a disagreement in regard to some rent and possession of a house, and also regarding an expense bill for a meter. He testified that Mr. McCaslin about two months prior to his death told the witness that he had once thought he was going to sustain a loss on Mr. Willis, but that he had paid off the debt in full.

The defendants had offered to prove by the defendant Paul M. Moore, trustee in the deed of trust, who had also been acting in the capacity of an attorney for Mr. McCaslin, that in August or the early part of September he had made statements to the attorney regarding the Willis indebtedness which were wholly inconsistent with the alleged statement that the Willis debt had been paid off in full. This testimony was offered in advance of that regarding the alleged statement of the deceased against interest. and was objected to, on the ground that any

conversation between the attorney and the deceased was privileged; and the objection was sustained on the theory that neither a legal representative nor an heir could waive such privilege. The Court has so held in regard to the disclosure by a physician of the communication of a deceased patient, in construing Section 1697, Code of 1942, which expressly provides that the disclosure can not be made "except at the instance of the patient." McCaw v. Turner, 126 Miss. 260, 88 So. 705. But the rule as to when, and under what circumstances, the declarations of a decedent are admissible in evidence when testified to by lay witnesses at least is treated in 20 Am. Jur., p. 521; 31 C. J. S., Evidence, sec. 205, pp. 942, 943; and 22 C. J., pp. 216, 217. In 20 Am. Jur., p. 521, it is said: "In the absence of statute, the death of a declarant is not in itself a ground for invoking an exception to the hearsay rule which renders unsworn statements inadmissible in evidence. Under certain circumstances, however, statements made by a person since deceased are admissible under an exception to such rule, based on the ground of necessity. . . . On principle, such declarations are not admitted as of necessity if other competent evidence is available."

In the case at bar, the complainants having claimed their legal exemption from being questioned regarding their alleged payment of the note, and having invoked an alleged admission of the deceased against interest, it would seem that the ends of justice would require the allowance of the exception insofar as the hearsay evidence rule is concerned, since the decedent is no longer able to deny that he made it, and the ends of justice may demand that the exception be allowed to be met in rebuttal by a counter-exception that he made declarations to the contrary of those alleged to have been made against his interest. Gordon v. Munn, 87 Kan. 624, 125 P. 1, Ann. Cas. 1914A, 783, rehearing denied 88 Kan. 72, 127 P. 764, Ann. Cas. 1914A, 783; Cooper v. Bower, 78 Kan. 156, 96 P. 59, rehearing denied 78 Kan. 164, 96 P. 794; Cannon v. Baker, 97 S. C. 116, 81 S. E. 478.

Here the witness offered was both an attorney and the trustee in the deed of trust; and as such trustee he was the agent of all the parties to the deed of trust, and it is contended by the appellants that he was at least entitled to testify as to any instructions given him as such trustee, to be followed in the event a foreclosure should thereafter become necessary, even if not entitled to relate any other statements made by the deceased inconsistent with an alleged statement against interest, and especially where made subsequent as here to the alleged admission against interest that the debt had been paid off in full.

We have no privileged communications statute as to attorney and client, other than section 8665, Code 1942, which requires attorneys ''to maintain inviolate the confidence and, at every peril to themselves, to preserve the secrets of their clients.'' In other words, we have no statute regarding privileged communications between attorney and client which expressly provides that a disclosure cannot be made except with the consent of the client, as is true under section 1697, Code 1942, supra, relating to those between a physician and patient, which was before the Court as aforesaid in the case of McCaw v. Turner, supra. At any rate, we are of the opinion that under the rule stated in 20 Am. Jur., p. 521, hereinbefore quoted, the witness, even though occupying the relation of an attorney for Mr. McCaslin as well as that of a trustee in the deed of trust, was competent to testify under the circumstances to refute the contention when made that the said deceased had made the alleged statement against interest that the debt had been paid.

On the direct examination of this witness, there was introduced, as an exhibit to his testimony, and without objection, a letter which he had written to Mr. Willis after the death of Mr. McCaslin, wherein he requested him to call by his office one day during the following week to discuss the matter of this indebtedness to the McCaslin estate; and it was also shown that no reply was received

to this letter, and that the request contained therein was wholly ignored.

The trial court suggested the view that since the former deeds of trust, of which the one here involved was a renewal, had not been recorded, the one now sought to be cancelled may have been recorded after payment, for the purpose of having the same cancelled, so as to clear the record. However, it was recorded two days after its execution, and Mr. Willis had stated to the witness, Lovern, that the same was surrendered to him when he paid the note, and it could not therefore have been in McCaslin's possession after its alleged payment. Moreover, it is alleged in the bill of complaint that the same had "ever since that day and up to this very day and hour been in the possession of the said J. M. Willis." The chancery clerk was not offered as a witness to show to whom the deed of trust was delivered after its recordation, and there would have been no occasion for the clerk to have ever had the note in his possession.

The proof further disclosed that Mr. McCaslin had found it necessary, several days prior to the execution of this note and deed of trust, to pay the taxes on the land in order to protect his then existing security, and that at the time of his death he held an open account against Willis for some additional borrowed money—a circumstance bearing on the question as to whether the latter had been in position to pay a $3,704.68 note in cash within a few days after the execution of the same in the month of May, when he had received no cash in connection with this renewal transaction.

It is to be conceded, as held by the trial court, that the law will not presume that the possession of a note by the maker has been obtained wrongfully or unlawfully from the payee; but it is also true that such a presumption need not be indulged, in order to account for the maker being in possession of a note without it having been paid. A creditor may retain an old note and deed of trust, pending the recordation of a new deed of trust given in re-

newal of the indebtedness, and then, through an honest mistake, may surrender the new ones to the makers, instead of the old ones, and thereafter fail to discover the error until at or near the maturity of such indebtedness.

From all the facts and circumstances of this case, it would seem that the chancellor was evidently influenced in his decision by the assumption that the possession of the note by the makers thereof before its maturity placed the burden on the widow of the payee to overturn the supposed prima facie case of payment, since otherwise we are not prepared to say with confidence that the same result would have been reached.

We are of the opinion that the mere possession alone by the complainants of the written evidence of their indebtedness was insufficient to meet the burden of proof resting on them to show payment, for the reasons (1) that they had not thereby sufficiently proved, under subsection (4) of section 160, Code 1942, any act which will discharge a simple contract for the payment of money; and (2) because they did not become the holders of the note at or after its maturity in their own right, within the meaning of subsection (5) of said statute, since their bill of complaint alleged, and their proof disclosed, that they came into possession of the same prior to its maturity, at a time when they were then under no obligation to pay it. Hence, no presumption arose that they had complied with any duty then resting upon them to do so, such as would render the possession of a note by the makers the prima facie proof of its payment.

In 8 Am. Jur. 439, it is stated: ''It seems clear that under the Uniform Act an instrument is not discharged by the acquisition thereof by the principal debtor prior to its maturity, both because another section provides that where an instrument is negotiated back to a prior party, such party may, subject to the provisions of this act, reissue and further negotiate the same.'' Citing Harding v. Hagler, 176 Ark. 146, 3 S. W. (2d) 289, 58 A. L. R. 175; Horn v. Nicholas, 139 Tenn. 453, 201 S. W.

756, L. R. A. 1918E, ·157. Likewise, in 11 C. J. S., Bills and Notes, sec. 662, pp. 106, 107, it is stated: "Payment of a bill or note will be presumed from possession, after maturity, by maker or acceptor, or by a surety, or one who has assumed the obligation, particularly if the note is marked 'paid;' . . . " Also, that "the obligor's possession of a negotiable instrument before it is due of itself creates no presumption of payment, although where a note is payable 'on or before' a certain date, the presumption applies even though in the maker's possession before the specified date, since payment before that date is payment according to the tenor and effect of the instrument." However, in the instant case the note is not due "on or before", but is due and payable as heretofore stated December 15, 1942. It is also stated in this text that such presumption of payment does not arise "if possession may be satifactorily accounted for upon any reasonable theory other than that of payment."

There is contained an annotation under the case of Dencer, Executrix, v. Jory, 131 Or. 653, 284 P. 163, reported in 70 A. L. R. 855, stating the general rule as to the presumption of payment arising from the possession by the makers of an instrument calling for the payment of money, and citing numerous authorities which announced the rule, but which annotation also discusses the exceptions thereto, and under subdivision 3 of such exceptions it is said, "it appears to be generally held that the maker's possession of a promissory note before maturity does not raise a presumption of payment or discharge. Peltier v. McFerson, 1919, 67 Colo. 505, 186 P. 524;· Haldeman v. Martin, 1928, 205 Iowa 302, 217 N. W. 851; Morris v. Morton, 1883, 14 Neb. 358, 15 N. W. 725·; Erwin v. Shaffer, 1858, 9 Ohio St. 43, 72 Am. Dec. 613; Eckert v. Cameron, 1862, 34 Pa. 120; Witte v. Williams, 1876, 8 S. C. 290, 28 Am. Rep. 294."·

In discussing the case of Eckert v. Cameron, 43 Pa. 120, among the above citation of cases, the note quotes from the decision the following: "A bill or note which has

been once in circulation, overdue, and coming from the hands of the acceptor or maker, is presumed to be extinguished . . . This is because it was the duty of the maker or acceptor to take it up when it fell due, and therefore it is fairly inferable from his possession of it, after that time, that it has fulfilled its office. But, before it has fallen due, the maker of a promissory note is under no obligation to take it up, and the reason fails for presuming its extinguishment from his then having it in his possession. And, with the failure of the reason, it is fair to conclude that the rule also ceases.''

We have examined the decisions of our own Court discussed in the briefs, and do not find that they are in conflict with the authorities hereinbefore cited from other jurisdictions. Nor do any of them decide the precise question here involved.

Therefore, for the reasons herein stated, we are of the opinion that the case should be reversed and remanded for a new trial.

Reversed and remanded.